No. 24-10563-H

# In the United States Court of Appeals for the Eleventh Circuit

**FANNIE WRIGHT,**
**Appellant/Petitioner,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE,**
**Appellee/Respondent.**

ON APPEAL FROM
THE UNITED STATES TAX COURT
No. 21509-18
Hon. Joseph H. Gale, Tax Court Judge, Presiding

_____

**OPENING BRIEF FOR APPELLANT**
_____

Joseph A. DiRuzzo, III
Fla. Bar No. 0619175
jd@margulisgelfand.com
Daniel M. Lader
Fla. Bar No. 1004963
dan@margulisgelfand.com
Stone T. Hendrickson
MO Bar No. 74384
stone@margulisgelfand.com

MARGULIS GELFAND DIRUZZO
& LAMBSON
401 East Las Olas Blvd., Suite 1400
Fort Lauderdale, FL 33301
954.615.1676 (o)
954.827.0340 (f)

*Pro Bono Counsel for the Appellant*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel for Appellant, pursuant to Local Rule 26.1-1 certifies that, to the best of Appellant's knowledge, the following is a complete list of interested persons:

**Judges Below:**

Hon. Joseph H. Gale

**Parties:**

Fannie Wright

Commissioner of Internal Revenue

**Attorneys for the Government:**

Derek P. Richman

Joseph W. Spires

Robert W. Dillard

Daniel C. Munce

Michael J. Desmond

Francesca Ugolini

William M. Paul

Bethany B. Hauser

**Attorneys for the Appellant:**

Joseph A. DiRuzzo, III

Daniel M. Lader

Stone T. Hendrickson

***

There are no publicly traded companies that own 10% or more or any interest of any party to the instant litigation.

## STATEMENT REGARDING ORAL ARGUMENT

Because of the complexity and significance of the issues involved, which (to the best of the undersigned's knowledge) present questions of first impression for this or any Court of Appeals, Appellant respectfully requests oral argument, which Appellant believes would assist this Court in the determination of the issues presented on appeal.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................................. i

STATEMENT REGARDING ORAL ARGUMENT ................................................ ii

TABLE OF CONTENTS ........................................................................... iii

TABLE OF AUTHORITIES ........................................................................ v

STATEMENT OF SUBJECT MATTER & APPELLATE JURISDICTION ............ 1

STATEMENT OF THE ISSUES .................................................................. 1

STATEMENT OF RELATED CASES & PROCEEDINGS ................................... 1

STATEMENT OF THE CASE ..................................................................... 2

    I.   FACTS. ........................................................................................ 2

    II.   PROCEDURAL HISTORY. .............................................................. 4

    III.  RULINGS PRESENTED FOR REVIEW. ........................................... 5

SUMMARY OF THE ARGUMENT ............................................................. 5

STANDARD OF REVIEW .......................................................................... 6

ARGUMENT ........................................................................................... 6

    I.   BACKGROUND. ........................................................................... 6

        A.   The Statutory Design and Judicial Interpretation of the Tax Court. .......... 7

            1.   The D.C. Circuit's Decision in *Kuretski*. ................................. 7

            2.   Post-*Kuretski* Statutory Amendment to Section 7441. ............... 9

            3.   The Tax Court's Decision in *Battat*. ...................................... 10

            4.   The D.C. Circuit's Decision in *Crim*. ..................................... 11

        B.   The Separation of Powers and Article II of the Constitution. .................. 12

    II.  THE TAX COURT IS AN EXECUTIVE BODY THAT EXERCISES EXECUTIVE POWERS WHILE RESTRICTING PRESIDENTIAL CONTROL IN VIOLATION OF ARTICLE II.. 16

        A.   The For-Cause Protection of Section 7443(f) is Unconstitutional. ........... 16

B.  The Tax Court Does Not Fit the Limited Exceptions Permitting Certain Restrictions on the President's Removal Authority Over Principal Officers. ...................................................................................................... 21

III. IF THE TAX COURT IS NOT AN EXECUTIVE ENTITY EXERCISING EXECUTIVE POWER, THE PRESIDENT'S REMOVAL AUTHORITY VIOLATES THE SEPARATION OF POWERS DOCTRINE. ........................................................................ 30

A.  The Tax Court is an Article I Court that Solely Exercises Judicial Power, Fully Independent of the Executive Branch. ............................................... 30

B.  The Separation of Powers Doctrine is not Limited to Article III Judges and Applies with Equal Force to Article I Judges. ............................................ 33

C.  *Battat* Misapplied Supreme Court Separation of Powers Precedents, and the Analysis is the same for Article I Judges as Article III judges. ................... 36

1.  *Bowsher v. Synar.* ........................................................................ 36

2.  *Morrison v. Olson.* ...................................................................... 38

3.  *Mistretta v. United States.* ........................................................... 39

4.  *McAllister v. United States.* ......................................................... 41

D.  The Public Rights Doctrine has no Impact on a Separation of Powers Analysis. ...................................................................................... 43

IV. A VALID JOINT RETURN IS A REQUIRED FINDING TO UPHOLD A DETERMINATION DENYING INNOCENT SPOUSE RELIEF. ............................................................. 47

CONCLUSION ............................................................................................ 53

CERTIFICATE OF COMPLIANCE RE: WORD COUNT ................................... 56

CERTIFICATE OF SERVICE ......................................................................... 56

# TABLE OF AUTHORITIES

## Cases

*Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652 (2017)..............................31

*Battat v. Comm'r*, 148 T.C. 32 (2017)....................................................passim

*Bowsher v. Synar*, 478 U.S. 714 (1986) ...................................... 35, 37, 38, 47

*Collins v. Mnuchin*, 896 F.3d 640 (5th Cir. 2018), *on reh'g en banc*, 938 F.3d 553 (5th Cir. 2019), *aff'd in part, vacated in part, rev'd in part sub nom. Collins v. Yellen*, 141 S. Ct. 1761 (2021).................................................................. 16, 19, 20

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) ...............................................passim

*Crim v. Comm'r of Internal Revenue*, 66 F.4th 999 (D.C. Cir. 2023)....................passim

*Edmond v. United States*, 520 U.S. 651 (1997)........................................38, 55

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235 (11th Cir. 2018) .........................................................................................7

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) .........passim

*Freytag v. Comm'r*, 501 U.S. 868 (1991)...................................... 8, 32, 33, 48

*Groves v. Comm'r*, T.C. Memo. 1957-196, 1957 WL 810 (1957)........................50, 51

*Heim v. Commissioner*, 27 T.C. 270 (1956), *aff'd*, 251 F.2d 44 (8th Cir. 1958) ..........49

*Helfrich v. Comm'r*, 25 T.C. 404 (1955) .................................................52

*Henson v. Santander Consumer USA, Inc.*, 137 S. Ct. 1718 (2017) ...............................32

*I.N.S. v. Chadha*, 462 U.S. 919 (1983).................................................13, 35

*Jones v. Comm'r of Internal Revenue*, T.C. Memo. 2019-139, 2019 WL 5212450 (T.C. 2019) ......................................................................................53

*Kuretski v. Comm'r*, 755 F.3d 929 (D.C. Cir. 2014) .............................................passim

*Lucia v. S.E.C.*, 585 U.S. 237 (2018) .......................................................55

*Martin v. Hunter's Lessee*, 14 U.S. 304 (1816) ...............................................13

*McAllister v. United States*, 141 U.S. 174 (1891) ............................................. 42

*McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020) ................................................. 30

*McIntosh v. Royal Caribbean Cruises, Ltd.*, 5 F.4th 1309 (11th Cir. 2021) ................... 53

*McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004) ...................................... 46, 47

*Mistretta v. United States*, 488 U.S. 361 (1989) .......................................... passim

*Morrison v. Olson*, 487 U.S. 654 (1988) .................................................... 39

*Myers v. United States*, 272 U.S. 52 (1926) ................................................ 21

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) 35, 45

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365 (2018) .... 45

*Okorogu v. Comm'r of Internal Revenue*, T.C. Memo. 2017-53, 2017 WL 1192118 (2017)
    .................................................................................. 49, 52

*PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75 (D.C. Cir. 2018) ............ passim

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995)....................................... 16

*Purpose Built Fams. Found., Inc. v. United States*, 95 F.4th 1346 (11th Cir. 2024) ....... 53

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020) ................ passim

*Snyder v. Comm'r*, T.C. Memo. 1983-751, 1983 WL 14739 (1983) ........................... 51

*Symons v. Chrysler Corp. Loan Guarantee Bd.*, 670 F.2d 238 (D.C. Cir. 1981)............. 32

*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021) ............................... 21, 28, 30

*United States v. Kapordelis*, 569 F.3d 1291 (11th Cir. 2009) ............................... 7

*United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004) ................................. 34

*Williams v. Taylor*, 529 U.S. 362 (2000)................................................... 31

*Williams v. United States*, 289 U.S. 553 (1933) ........................................... 36

**Statutes**

5 U.S.C. § 1201 ............................................................................ 23

5 U.S.C. § 1203(a) ......................................................................... 23

26 U.S.C. § 6015(a)(1), (b)(1)(A), and (c)(1) ............................................. 49

26 U.S.C. § 6015(e)(1) ..................................................................................... 2

26 U.S.C. § 6020(b)(1) ................................................................................... 50

26 U.S.C. § 6201(a)(1) ................................................................................... 50

26 U.S.C. § 6228(a) ........................................................................................ 46

26 U.S.C. § 7402 ............................................................................................ 45

26 U.S.C. § 7441 ..................................................................................... passim

26 U.S.C. § 7442 ............................................................................................ 32

26 U.S.C. § 7443(b) ........................................................................................ 11

26 U.S.C. § 7443(e) ........................................................................................ 26

26 U.S.C. § 7443(f) .............................................................................. 11, 17, 20

26 U.S.C. § 7443(g) ........................................................................................ 42

26 U.S.C. § 7444(b) ........................................................................................ 26

26 U.S.C. § 7444(c) ........................................................................................ 26

26 U.S.C. § 7456 .............................................................................................. 8

26 U.S.C. § 7456(c) .......................................................................................... 8

26 U.S.C. § 7482(a)(1) ..................................................................................... 2

28 U.S.C. § 152(e) .......................................................................................... 36

28 U.S.C. § 176(a) .......................................................................................... 36

28 U.S.C. § 596(b)(2) ..................................................................................... 39

28 U.S.C. § 631(i) ........................................................................................... 36

28 U.S.C. § 1346 ............................................................................................ 45

28 U.S.C. § 1346(a) ........................................................................................ 46

28 U.S.C. § 1491 ....................................................................................... 45, 46

31 U.S.C. § 703(e)(1)(B) ................................................................................ 37

48 U.S.C. § 1561 ............................................................................................ 43

48 U.S.C. § 1612(a) ........................................................................... 45

Pub. L. 91–172, 83 Stat. 487 ............................................................ 8

**Other Authorities**

1 Annals of Cong. (1789) (J. Madison) ......................................20, 21

Rev. Proc. 2013-34 ...........................................................................52

S. Rep. 114-14 ..................................................................................10

The Federalist No. 51 (J. Cooke ed. 1961) (J. Madison) ................14

The Federalist No. 70 (A. Hamilton) ..............................................14

**Constitutional Provisions**

U.S. Const. art. II, § 3 ............................................................. passim

U.S. Const. art. III, § 1 ...........................................................45, 54

U.S. Const. art. IV, § 3 .................................................................43

**STATEMENT OF SUBJECT MATTER & APPELLATE JURISDICTION**

The Tax Court had jurisdiction under 26 U.S.C. § 6015(e)(1). This Court has jurisdiction pursuant to 26 U.S.C. § 7482(a)(1).

**STATEMENT OF THE ISSUES**

1. Whether the Tax Court erred as a matter of law in finding that the for-cause limitation on the President's removal authority over Tax Court judges under 26 U.S.C. § 7443(f) does not violate Article II of the U.S. Constitution; or, if not,

2. Whether the Tax Court erred as a matter of law in finding that the President's removal authority over Tax Court judges under 26 U.S.C. § 7443(f) does not violate the Separation of Powers Doctrine; and

3. Whether the Tax Court is required to find that a legally effective joint tax return was filed in order to uphold a final determination denying innocent spouse relief.

**STATEMENT OF RELATED CASES & PROCEEDINGS**

There are no related cases between the Parties. To the best of the undersigned's knowledge, no cases involving the same issue are pending appeal in this Court.

## STATEMENT OF THE CASE

### I.    FACTS.

Appellant was married to Willie Wright ("Mr. Wright") during the taxable years at issue (2013, 2014, and 2015) and until Mr. Wright's death in August 2016. R.45[1] at 58-59; R.40 at 31 (Ex. 4-J). Appellant and Mr. Wright began filing joint federal income tax returns after their marriage in 1973. R.45 at 64-65.

In the early 1990s, when Appellant's and Mr. Wright's daughter began attending college, Mr. Wright refused to participate in obtaining student loans and Appellant, individually, assisted in obtaining them, which fell into default around 2006 or 2007. R.45 at 65-66. Appellant and Mr. Wright stopped filing jointly and began filing individually (married filing separately) shortly after the loans went into default, which Appellant believed was why Mr. Wright did not want to file jointly with Appellant. R.45 at 78.

Appellant worked as a licensed practical nurse for decades until May 2012, when she suffered a workplace injury. R.45 at 56-57. Appellant believed, based on advice from her attorney and her tax return preparer, that she would no longer have to file tax returns after she stopped working due to her workplace injury. R.45 at 71-

---

[1] Citations to the record are styled as "R.## at ##." Pages of the trial transcript (R.45) reference the numbers at the top right of the pages (not the PDF, which includes an unnumbered cover page).

2

73. Appellant filed her taxes individually (i.e., separately from Mr. Wright) for each of the years 2008 through 2012, which was the last year she earned income through employment. R.45 at 69; R.41 ¶ 33. After working for part of the year in 2012, beginning in 2013, Appellant's only source of income was social security benefits. R.45 at 74-75.

Mr. Wright requested to file jointly with Appellant again beginning for tax year 2013; however, Appellant did not want to resume filing jointly. R.45 at 85. Appellant signed a document for tax year 2013 at the request of Mr. Wright that Appellant believed was only to state that she was disabled. Appellant could not recall what the specific document she signed was, but signed it solely to state that she was disabled. R.45 at 80-81.

Appellant believed that Mr. Wright had tricked her into signing a document in 2013 despite Appellant asserting to Mr. Wright that Appellant was not required to file taxes for 2013. Appellant did not agree to file jointly with Mr. Wright for 2013 and refused to sign any document for years 2014 and 2015. R.45 at 83-84; 101-103. Appellant did not file a tax return for 2014. Mr. Wright asked Appellant about filing jointly with him but Appellant responded, "No," because, as Mr. Wright had previously not wanted to file jointly with Appellant, she did not want to file with Mr. Wright, and she was advised that she did not have to file. R.45 at 75.

3

Appellant testified she did not intend to file a joint tax return with Mr. Wright for 2013, 2014, or 2015. R.45 at 75-77; 110-111:1; *see also* R.40 at 9-15, 69 (Ex. 1-J, Ex. 8-J).

## II.  PROCEDURAL HISTORY.

On August 6, 2018, the IRS Independent Office of Appeals issued a final determination denying Appellant innocent spouse relief under Section[2] 6015(b), (c) and (f) for 2013 and 2014 and under Section 6015(f) for 2015. R.36. On October 26, 2018, Appellant timely filed her petition for determination of relief from joint and several liability. R.1.

During the course of the litigation, Appellant filed a series of motions, each of which was denied by the Tax Court. The case proceeded to trial in February 2020, at which Appellant was the sole witness and testified that she never intended to file a joint tax return with Mr. Wright for any of the years at issue and that after being tricked into signing a document for 2013 that she believed was simply to attest to being disabled, she refused to sign anything for 2014 or 2015. *See, e.g.*, R.45 at 75-77.

However, the Tax Court made no finding as to whether any valid joint tax return existed for any year at issue; rather, it held, "[r]egardless of whether Appellant consented to having joint returns filed on her behalf, we lack jurisdiction to review

---

[2] "Section" references Title 26, U.S. Code (the Internal Revenue Code, the "Code").

that claim in this proceeding insofar as it might bear on the correctness of the assessments." R.63 at 6. Appellant timely filed her notice of appeal and timely filed her amended notice of appeal. R.65, R.68.

## III.    RULINGS PRESENTED FOR REVIEW.

Appellant appeals the Decision (R.64) and Memorandum Opinion (R.63), the Order (R.62) denying Appellant's Motion to Declare 26 U.S.C. § 7443(f) Unconstitutional, and (3) the Order (R.32) denying Appellant's Motion to Disqualify & Motion to Declare 26 U.S.C. § 7443(f) Unconstitutional.

## SUMMARY OF THE ARGUMENT

Section 7443(f) violates the Constitution's requirement of presidential control over the exercise of Article II powers. The Tax Court does not fit the historically-allowed exceptions to at-will removal of Executive Officers by the President.

Alternatively, if the Tax Court is not an Article II entity exercising Executive power, the President's ability to remove Tax Court judges violates the Separation of Powers Doctrine's prohibition of interbranch removal. If the Tax Court does not exercise Executive power, the President's removal authority over Tax Court judges threatens the integrity of the judicial process and unconstitutionally affords the President control over non-Executive power.

Lastly, a finding that a valid joint tax return was filed for each year at issue is a necessary element to uphold a determination denying a taxpayer relief from joint and several liability.

## STANDARD OF REVIEW

"[Q]uestions of law are reviewed *de novo*" by this Court. *United States v. Kapordelis*, 569 F.3d 1291, 1306 (11th Cir. 2009). Likewise, the "plenary standard applies to questions of constitutional law." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1239 (11th Cir. 2018).

## ARGUMENT

### I.    BACKGROUND.

Both the Tax Court and the D.C. Circuit have considered whether the President's removal power under Section 7443(f) is unconstitutional based on allegations of impermissible *interbranch* encroachment violating the separation of powers. *See Battat v. Comm'r*, 148 T.C. 32 (2017); *Kuretski v. Comm'r*, 755 F.3d 929 (D.C. Cir. 2014); *Crim v. Comm'r of Internal Revenue*, 66 F.4th 999 (D.C. Cir. 2023). Both Courts held in the negative – but based on entirely different (and incompatible) reasoning.

The Tax Court below, upheld *Battat*, R.32, and also held that Section 7443(f) is not unconstitutional for violating Article II. R.62. Accordingly, this Court is squarely presented with the questions of where the Tax Court is situated, what

governmental power(s) it exercises within our constitutional design, and, consequently, whether Section 7334(f) passes constitutional muster. Regardless of the Tax Court's precise character, this Court should hold Section 7443(f) cannot stand.

## A.    The Statutory Design and Judicial Interpretation of the Tax Court.

The Tax Court was codified as an independent executive agency prior to 1969, when the Tax Reform Act of 1969 removed the explicit designation, *see* Pub. L. 91–172, 83 Stat. 487, leaving its precise nature subject to judicial interpretation. However, its powers were expanded and codified, *see generally, e.g.,* 26 U.S.C. § 7456 (entitled, "Administration of oaths and procurement of testimony"), to include the contempt "power to punish by fine or imprisonment," 26 U.S.C. § 7456(c), and the power to "have such assistance in the carrying out of its lawful writ, process, order, rule, decree, or command as is available to a court of the United States...." 26 U.S.C. § 7456(c) (flush language).

Thus, the Tax Court was codified to mirror, within the context of federal taxation, a court of law established under Article III that exercises the judicial power of the United States.

### 1.    The D.C. Circuit's Decision in *Kuretski.*

In *Kuretski*, the D.C. Circuit noted that the Supreme Court in *Freytag v. Comm'r,* 501 U.S. 868 (1991), had "observed that the Tax Court exercises a portion of the

judicial power of the United States." 755 F.3d at 941 (cleaned up). It explained that the "*Freytag* Court clarified that non-Article III tribunals exercise the judicial power of the United States, such that the judicial power of the United States is not limited to the judicial power defined under Article III." *Id.* (cleaned up). Thus, the "Tax Court is an adjudicative body" and "[a] tribunal constitutes a 'legislative court' if its power is not conferred by the third article of the Constitution, but by Congress in the execution of other provisions of that instrument." *Id.* at 941, 942 (cleaned up).

Nevertheless, it continued, "[t]he Tax Court's status as an Article I legislative court, does not mean that its judges exercise 'legislative power' under Article I." *Id.* at 943. Therefore, *Freytag* "explained that Tax Court judges do not exercise the 'judicial power of the United States' pursuant to Article III [and] also explained that Congress's establishment of the Tax Court as an Article I legislative court did not transfer the Tax Court to the Legislative Branch." *Id.*

> [T]he Kuretskis have failed to persuade us that Tax Court judges exercise their authority as part of any branch other than the Executive. Consequently, if a President were someday to exercise the authority under 26 U.S.C. § 7443(f) to remove a Tax Court judge for cause, the removal would be entirely consistent with separation-of-powers principles.

*Id.* at 939. That is so, according to the *Kuretski* court, because "[e]ven if the 1969 Act transformed the Tax Court into an Article I legislative court, it did not thereby transfer

the Tax Court to the Legislative Branch." *Id.* at 942. "It follows that the Tax Court exercises its authority as part of the Executive Branch." *Id.* at 943.

Ultimately, *Kuretski* concluded, because "the Tax Court, in our view, exercises Executive authority as part of the Executive Branch[, p]residential removal of a Tax Court judge thus would constitute an intra—not inter—branch removal." *Id.* at 932. Therefore, the D.C. Circuit held there was no constitutional infirmity with "presidential removal of Tax Court judges" because "the Tax Court exercises its authority as part of the Executive Branch." *Id.* at 943.

### 2.    Post-*Kuretski* Statutory Amendment to Section 7441.

After *Kuretski,* Congress amended the Code to state, "[t]he Tax Court *is not an agency of, and shall be independent of, the executive branch of the Government.* 26 U.S.C. § 7441 (emphasis added).

> Extant law provides, Congress has
>
> established, under article I of the Constitution of the United States, a court of record to be known as the United States Tax Court. The members of the Tax Court shall be the chief judge and the judges of the Tax Court. The Tax Court is not an agency of, and shall be independent of, the executive branch of the Government.

*Id.* And, consistent with that language, the legislative history makes pellucid congressional intent that the Tax Court "*is not part of the Executive Branch.*" S. Rep. 114-14 (emphasis added).

However, Section 7443's appointment and removal provisions were not amended; it remains that after "appoint[ment] by the President, by and with the advice and consent of the Senate," 26 U.S.C. § 7443(b), "[j]udges of the Tax Court may be removed by the President, after notice and opportunity for public hearing, for inefficiency, neglect of duty, or malfeasance in office, but for no other cause." 26 U.S.C. § 7443(f).

### 3.   The Tax Court's Decision in *Battat.*

The Tax Court considered a similar challenge as the D.C. Circuit in *Kuretski, after* the statutory amendment, and acknowledged,

> [i]n the explanation of the change contained in the report of the Senate Finance Committee, the Committee said it was—
>
>> concerned that statements in *Kuretski v. Commissioner* may lead the public to question the independence of the Tax Court, especially in relation to the Department of Treasury or the Internal Revenue Service. The Committee wishes to remove any uncertainty caused by *Kuretski v. Commissioner*, and to ensure that there is no appearance of institutional bias.

*Battat,* 148 T.C. at 49 (citation omitted).

The Tax Court diverged with the D.C. Circuit's reasoning, concluding that, "[w]hile the Tax Court exercises a portion of the judicial power of the United States, it has jurisdiction to adjudicate only public rights disputes, and thus does not exercise that portion of the judicial power that is reserved for Article III judges." *Id.* at 53.

10

Ultimately, *Battat* "conclude[d] that *regardless of the branch location of the Tax Court,* provisions authorizing removal of Tax Court Judges are constitutional." *Id.* at 52 (emphasis added).

### 4.    The D.C. Circuit's Decision in *Crim*.

In *Crim*, the D.C. Circuit considered substantially the same arguments it was presented with in *Kuretski* (i.e., interbranch Separation of Powers), but (like *Battat*) *after* the statutory amendment to Section 7441. In its view, Section 7441 "describe[s] the Tax Court's functional independence rather than its constitutional status," and "in 1969, Congress, in departing from the prior language describing the Tax Court as an executive 'agency,' aimed to emphasize the Tax Court's independence as a 'court' reviewing the actions of the IRS." *Crim*, 66 F.4th at 1001 (cleaned up). Finally, with the 2015 amendment, "Congress sought only to ensure that there is no appearance of institutional bias when the Tax Court adjudicates disputes between the IRS and taxpayers." *Id.* (cleaned up).

Thus, the D.C. Circuit rejected the interbranch arguments "[b]ecause the Tax Court exercises its authority as part of the Executive Branch" even after the statutory amendment. *Id.* at 1000 (cleaned up).

And, Judge Walker (dissenting from the majority with respect to Section 6700 penalties only) explained: "If the Tax Court *were* outside of the executive branch, the

11

President's power to remove its judges would be problematic. But because the Tax Court is inside the executive branch, there is no such problem." *Id.* at 1006 (Walker, J., dissenting) (emphasis in original). Judge Walker emphasized that the 2015 amendments to Section 7441 "did not change the Tax Court's position within our system of government. So the Tax Court *remains part of the executive branch*, just as it was before the amendment." *Id.* (Walker, J., dissenting) (emphasis added).

### B.    The Separation of Powers and Article II of the Constitution.

Early in our Republic, the Supreme Court explained that "[t]he object of the constitution was to establish three great departments of government; the legislative, the executive, and the judicial departments." *Martin v. Hunter's Lessee*, 14 U.S. 304, 329 (1816). And pursuant to that constitutional design, Article II of the Constitutional vests the Executive power in and requires that the President "shall take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3.

Clearly, "[t]he principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the documents that they drafted in Philadelphia in the summer of 1787." *I.N.S. v. Chadha*, 462 U.S. 919, 946 (1983) (cleaned up). "The very structure of the articles delegating and separating powers under Arts. I, II, and III exemplify the concept of separation of powers[.]" *Id.*

12

> The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty. Their solution to governmental power and its perils was simple: divide it. To prevent the gradual concentration of power in the same hands, they enabled ambition to counteract ambition at every turn. At the highest level, they "split the atom of sovereignty" itself into one Federal Government and the States. They then divided the powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial.

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2202 (2020) (cleaned up, quoting, *inter alia*, The Federalist No. 51, p. 349 (J. Cooke ed. 1961) (J. Madison)).

> The Executive Branch is a stark departure from all this division. The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that differences of opinion and the jarrings of parties would promote deliberation and circumspection and check excesses in the majority. By contrast, the Framers thought it necessary to secure the authority of the Executive so that he could carry out his unique responsibilities. As Madison put it, while the weight of the legislative authority requires that it should be divided, the weakness of the executive may require, on the other hand, that it should be fortified.

*Id.* at 2203 (cleaned up, quoting repeatedly, The Federalist No. 70 (A. Hamilton)).

Thus, as the entirety of Article II power is vested in the President, "[t]o justify and check *that* authority—unique in our constitutional structure—the Framers made the President the most democratic and politically accountable official in Government." *Id.* (emphasis in original). Consequently, "the President cannot delegate ultimate responsibility or the active obligation to supervise that goes with it, because Article II makes a single President responsible for the actions of the Executive

13

Branch." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 496–97 (2010) (cleaned up). In the language of the Constitution, "[t]he President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them." *Id.* at 484 (quoting U.S. Const. art. II, § 3).

This understanding of Executive power has been paramount to our history:

> The landmark case of *Myers v. United States* reaffirmed the principle that Article II confers on the President "the general administrative control of those executing the laws." It is *his* responsibility to take care that the laws be faithfully executed. The buck stops with the President, in Harry Truman's famous phrase.

*Id.* at 492-93 (cleaned up). "[O]ur Constitution 'was adopted to enable the people to govern themselves, through their elected leaders,' and the Constitution 'requires that a President chosen by the entire Nation oversee the execution of the laws.'" *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 167–68 (D.C. Cir. 2018) (Kavanaugh, *J.*, dissenting) (quoting *Free Enter. Fund* 561 U.S. at 499).

The people rely on the President to execute the law in the manner that best represents the will of the electorate.

> The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so. That power includes, as a general matter, the authority to remove those who assist him in carrying out his duties. Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else.

*Id.* at 513–14 (Kavanaugh, *J.*, dissenting).

14

If the people cannot determine who the elected officials are that make important decisions that impact their lives, the right to vote loses meaning.

> The diffusion of power carries with it a diffusion of accountability. The people do not vote for the "Officers of the United States." They instead look to the President to guide the assistants or deputies ... subject to his superintendence. Without a clear and effective chain of command, the public cannot determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall. That is why the Framers sought to ensure that those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.

*Free Enter. Fund.*, 561 U.S. at 497-98 (cleaned up).

And "the doctrine of separation of powers is a *structural safeguard* rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995) (emphasis in original). "'[S]tanding does not require precise proof of what the [agency's] policies might have been' had the agency's structure met constitutional requirements." *Collins v. Mnuchin*, 896 F.3d 640, 657 (5th Cir. 2018), *on reh'g en banc*, 938 F.3d 553 (5th Cir. 2019), *aff'd in part, vacated in part, rev'd in part sub nom. Collins v. Yellen*, 141 S. Ct. 1761 (2021) (quoting *Free Enter. Fund*, 561 U.S. at 512 n. 12). Indeed, the Supreme Court recently rejected the suggestion that prejudice is required:

> Our precedents say otherwise. We have held that a litigant challenging governmental action as void on the basis of the separation of powers is

not required to prove that the Government's course of conduct would have been different in a "counterfactual world" in which the Government had acted with constitutional authority. In the specific context of the President's removal power, we have found it sufficient that the challenger sustains injury from an executive act that allegedly exceeds the official's authority.

*Seila*, 140 S. Ct. at 2196 (cleaned up).

\* \* \*

No matter how one slices the Section 7441 and 7443(f) apple, the result is a violation of constitutional significance. *Either* the Tax Court is an Executive branch entity (as the D.C. Circuit holds) violating Article II's required Presidential control (an argument not considered by the D.C. Circuit), *or* the Tax Court is non-Executive, violating the Constitution's required separation of powers. In either event, Section 7443(f) is unconstitutional.

## II. THE TAX COURT IS AN EXECUTIVE BODY THAT EXERCISES EXECUTIVE POWERS WHILE RESTRICTING PRESIDENTIAL CONTROL IN VIOLATION OF ARTICLE II.

### A. The For-Cause Protection of Section 7443(f) is Unconstitutional.

If the Tax Court is an Executive entity, then Article II commands the President to ensure "that the Laws be faithfully executed" by the Tax Court. U.S. Const. art. II, § 3. However, Tax Court judges are immune from removal by the President except "for inefficiency, neglect of duty, or malfeasance in office[.]" 26 U.S.C. § 7443(f). Though not presented with the contention such restriction violates Article II, perhaps

presciently, Judge Walker observed that "tax judges cannot be truly and fully 'independent' because 'lesser officers must remain accountable to the President, whose authority they wield.' I express no opinion about whether tax judges' removal protection is constitutional." *Crim*, 66 F.4th at 1007 (Walker, *J.* dissenting) (quoting *Seila*, 140 S. Ct. at 2197).

Cause for concern is well founded.

As an Executive entity, "[t]he Tax Court is in the business of interpreting and applying the internal revenue laws[.]" *Kuretski*, 755 F.3d at 943. If "Congress's amendment [did] not change the Tax Court's powers[, which] are, and have always been, executive[,]" *Crim*, 66 F.4th at 1007 (Walker, *J.* dissenting), then Section 7443(f)'s for-cause limitation violates the President's powers required by Article II.

Forsooth, the Supreme Court's recognition that a similar for-cause removal limitation for the Public Company Accounting Oversight Board is unconstitutional applies with full force here:

> Neither the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, has full control over the [Tax Court judges]. The President is stripped of the power our precedents have preserved, and his ability to execute the laws—by holding his subordinates accountable for their conduct—is impaired.

*Free Enter. Fund*, 561 U.S. at 493.

17

The purpose of such unified control over executive power in the President is to provide the primary means of enforcing accountability on those lower executive branch officials who exercise it.

> Congress has plenary control over the salary, duties, and even existence of executive offices. Only Presidential oversight can counter its influence. That is why the Constitution vests certain powers in the President that the Legislature has no right to diminish or modify. The Framers created a structure in which a dependence on the people would be the primary control on the government.... A key constitutional means vested in the President—perhaps *the* key means—was the power of appointing, overseeing, and controlling those who execute the laws.

*Id.* at 500-01 (cleaned up).

"[A]bsent effective oversight tools, the Chief Executive could lose control over the Executive Branch." *Collins*, 896 F.3d at 663 (cleaned up) (citing *Free Enter. Fund*, 561 U.S. at 499). Section 7443(f)'s for cause removal protection makes Tax Court judges entirely unaccountable to the President – and, therefore, the people – leaving the President virtually no tools at his disposal to carry out Article II's obligations.

The for-cause limitation in *Free Enterprise* restricted the President's ability to control through removal to instances of "inefficiency, neglect of duty, or malfeasance in office. Thus, to the Court, *none of those Commissioners were subject to the President's direct control*" in violation of Article II." *Collins*, 896 F.3d at 663 (cleaned up, emphasis added, citing *Free Enter. Fund*, 561 U.S. at 485). And Section 7443 imposes an identical limitation on the President, confining removal power over Tax Court judges

18

for "inefficiency, neglect of duty, or malfeasance in office, but for no other cause." 26 U.S.C. § 7443(f).

But, in order to uphold the constitutional mandate of Article II, "to maintain 'adequate control' over his subordinates, the President must retain sticks that he can use to demand accountability—including the power to remove. As the *Free Enterprise* Court made clear, Congress cannot transform the President into a 'cajoler-in-chief' who can only offer carrots." *Collins*, 896 F.3d at 664 (footnotes omitted, quoting *Free Enter. Fund*, 561 U.S. at 502). Tax Court judges operate virtually free of any presidential oversight and without accountability to the people as they are unelected executive branch officers removable by the President for good cause only upon an official finding of explicitly limited and severe circumstances.

This violates the well-settled understanding that executive officials must be accountable to the President, and

> because the President, unlike agency officials, is elected, this control is essential to subject Executive Branch actions to a degree of electoral accountability. At-will removal ensures that "the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community."

*Collins v. Yellen*, 141 S. Ct. 1761, 1784 (2021) (cleaned up, quoting 1 Annals of Cong. 499 (1789) (J. Madison)).

Indeed,

[t]he President's removal power serves vital purposes even when the officer subject to removal is not the head of one of the largest and most powerful agencies. The removal power helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch, and it works to ensure that these subordinates serve the people effectively and in accordance with the policies that the people presumably elected the President to promote.

*Id.* (citing as examples *Seila*, 140 S. Ct. at 2196-97; *Free Enter. Fund*, 561 U.S. at 501-02; *Myers v. United States*, 272 U.S. 52, 131 (1926)).

In other words, "the President can neither oversee the [Tax Court judges] himself nor attribute the [Tax Court judges'] failings to those whom he *can* oversee. [Tax Court judges] accordingly exercise power that conflicts with the design of [Article II] to preserve political accountability." *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (cleaned up, emphasis in original).

Appellate review by Article III courts makes no difference if "the Tax Court exercises its authority as part of the Executive Branch," *Crim*, 66 F.4th at 1000 (cleaned up), because "[r]eview outside Article II... cannot provide the necessary supervision." *Arthrex*, 594 U.S. at 17. Tax Court judges are "exercising executive power and must remain 'dependent upon the President.'" *Id.* (quoting 1 Annals of Cong., at 611–612 (J. Madison). Under the extant statutory scheme, they do not.

Instead, the buck stops with Tax Court judges, contrary to Article II:

The President must be able to remove not just officers who disobey his commands but also those he finds negligent and inefficient, those who

exercise their discretion in a way that is not intelligent or wise, those who have different views of policy, those who come from a competing political party who is dead set against the President's agenda, and those in whom he has simply lost confidence.

*Collins*, 141 S. Ct. at 1787 (cleaned up).

Simply put, Section 7443(f) violates the President's undivided duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3. Moreover, Appellant need not allege nor prove harm because in *Seila* the Supreme Court reaffirmed its "precedents ... that a litigant challenging governmental action as void on the basis of the separation of powers is not required to prove that the Government's course of conduct would have been different in a 'counterfactual world' in which the Government had acted with constitutional authority." 140 S. Ct. at 2196 (citation omitted).

### B. The Tax Court Does Not Fit the Limited Exceptions Permitting Certain Restrictions on the President's Removal Authority Over Principal Officers.

The Supreme Court's precedents have allowed Congress to create independent agencies within the executive branch, but the High Court has been careful to explain that strict limitations apply.

For instance, "[w]hen Congress vests the appointment of inferior officers in the heads of Departments[,] it may limit and restrict the power of removal as it deems best for the public interest." *Free Enter. Fund,* 561 U.S. at 494 (cleaned up). However, such

21

atypical restrictions have only been allowed when "an officer directly responsible to the President and through [whom] the President could act, [had] several means of supervising or controlling" the appointee. *Id.* at 495 (cleaned up).

In the context of executive bodies directed by muti-member principal officers (typically referred to, though not technically defined as, independent agencies[3]), Congress has upheld for-cause removal restrictions *conditioned on other protections* to preserve presidential control. For instance, Congress created the Merit Systems Protection Board ("MSPB") with the typical independent-agency structural safeguards in place. The multi-member board is statutorily required to be bipartisan and the President has a powerful tool to align the board with the administration's policies by appointment of the chairperson. *See* 5 U.S.C. § 1201 ("The Merit Systems Protection Board is composed of 3 members appointed by the President, by and with the advice and consent of the Senate, not more than 2 of whom may be adherents of the same political party."); 5 U.S.C. § 1203(a) ("The President shall from time to time appoint, by and with the advice and consent of the Senate, one of the members of the Merit Systems Protection Board as the Chairman of the Board.").

---

[3] *See Collins*, 141 S. Ct. at 1783 ("the term 'independent' does not necessarily connote independence from Presidential control").

But Tax Court judges exercise unreviewable executive branch powers without *any* safeguards typical of independent executive agencies – e.g., dispersing power among muti-member heads, mandating bipartisanship, and giving a sitting President the authority to appoint the chairperson to align policy with the administration (as with the MSPB). Rather, it operates under its own, constitutionally deficient independence, without meaningful control by the President.

As explained by now-Justice Kavanaugh, even when Congress has validly imposed for-cause removal restrictions, unlike the unfettered independence of the Tax Court, "[n]othing comparable happens in traditional multi-member independent agencies. Rather, the traditional multi-member structure ordinarily allows the current President to exercise some influence over the agency through Presidential appointment. That is because the President may designate agency chairs and may remove agency chairs at will from their positions as chairs." *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 189 (D.C. Cir. 2018) (Kavanaugh, *J.*, dissenting), *abrogated by Seila*, 140 S. Ct. 2183 (considering the Consumer Financial Protection Bureau ("CFPB") and "hold[ing] that the CFPB's leadership by a single individual

removable only for inefficiency, neglect, or malfeasance violates the separation of powers." *Seila*, 140 S. Ct. at 2197).[4]

> And these Presidential tools are meaningful:
>
> The power to designate and remove chairs at will is important because, by statute, the chairs of multimember agencies have been granted budget, personnel, and agenda control....
>
> The chair of a multimember agency usually holds the position of chair—but not as a member of the agency—at the will of the President. After removal of an existing chair, the President can then appoint a new chair with preferences closer to his. *The ability of the President to retain policy influence through the selection of the chair is important* because ... the chair of a multimember agency is ordinarily its most dominant figure. While there is room for debate, *it is clear that the ability to appoint the head of an independent agency allows the President to retain some control over that agency's activities.* An appointed chair will align with the President for multiple reasons....
>
> By exercising their power to appoint chairs of the major multi-member independent agencies, Presidents may gain some control over the direction of those agencies within days of taking office at the start of their first terms. For example, President Trump replaced the chairs of the FTC, FCC, SEC, and NLRB within one week of taking office in January 2017. President Obama did the same by March 2009.

*Id.* at 189-90 (Kavanaugh, *J.*, dissenting) (cleaned up).

---

[4] *See also PHH Corp.*, 881 F.3d at 189 n. 15 (Kavanaugh, *J.*, dissenting) ("For example, the President unilaterally designates (and may unilaterally remove at will from the position as chair) the chairs of the following agencies..." (listing over a dozen examples).

But, just as "a President has no such power when it comes to the single Director of the CFPB, who serves a fixed five-year term[,]" *id.* at 190 (Kavanaugh, *J.*, dissenting), neither does a President have such power over the Chief Judge, as, on its own accord, "[t]he Tax Court shall at least biennially designate a judge to act as chief judge." 26 U.S.C. § 7444(b).

Nor is the Chief Judge of the Tax Court statutorily granted authority that would enable the Chief Judge to control and align the Tax Court with a President's policies. While authorized to "divide the Tax Court into divisions of one or more judges, assign the judges of the Tax Court thereto, and in case of a division of more than one judge, designate the chief thereof[,]" 26 U.S.C. § 7444(c), the Chief Judge is not, e.g., statutorily "granted budget, personnel, and agenda control." *PHH Corp.*, 881 F.3d at 189 (Kavanaugh, *J.*, dissenting), Rather, just like "the single-Director CFPB, with its fixed five-year Director term," the fifteen-year "term of office of [each] judge of the Tax Court[,]" 26 U.S.C. § 7443(e), "causes a diminution of Presidential power greater than the diminution that occurs in traditional multi-member independent agencies." *PHH Corp.*, 881 F.3d at 189 (Kavanaugh, *J.*, dissenting).

And even though the ability to appoint a chair is an effective tool, standing alone, it may not be enough to save a for-cause removal restriction from unconstitutionality. In such instances,

[t]here is more. In a multi-member agency, the commissioners or board members other than the chair serve staggered terms and are replaced by the President as their terms expire. A tradition has developed by which some commissioners or board members of the opposite party resign from independent agencies when a new President takes office. Even apart from that tradition, the staggered terms mean that a President will have ever-increasing influence (through appointments) over an independent agency during the course of that President's term. That does not occur with the single-Director CFPB.

*PHH Corp.*, 881 F.3d at 189 (Kavanaugh, *J.*, dissenting).

That does not occur with the Tax Court either. Alas, the fifteen years terms of Tax Court judges necessarily exceed any one President's maximum of eight years in office, and (except in the case of consecutive two-term Presidents where a Tax Court judge is appointed within the first year of the first President's term) a Tax Court judge is virtually guaranteed to serve over the course of at least three presidential administrations, with *at least* one President precluded from exercising removal without the explicit for-cause finding required under Section 7443(f) *for the entire term*. Every such President is, therefore, unable to appoint new, preferred Tax Court judges to align with the administration's goals.

Surely, that far exceeds the problem recognized by then-Judge Kavanaugh: "Until the Director's term expires, the new President has zero influence through appointment, and the zero remains zero until the Director's term expires." *Id.* (Kavanaugh, *J.*, dissenting). Consequently, "[t]his case therefore involves a *substantial*

additional diminution of Presidential authority beyond the diminution that occurs in a traditional independent agency." *Id.* at 191 (Kavanaugh, *J.*, dissenting) (emphasis in original.

Tax Court judges exercise executive branch power in a manner untraceable to the President – "[a]fter all, from the moment an [official] is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear." *Collins,* 141 S. Ct. at 1796 (Gorsuch, *J.*, concurring in part) (cleaned up). "Tax Court judges neither exercise judicial power in the particular sense employed by Article III, nor legislative power under Article I. Because the Tax Court exercises its authority as part of the Executive Branch," *Crim*, 66 F.4th at 1000 (cleaned up), Section 7443(f) violates Article II's mandate that "the President [must] remain[] responsible for the exercise of executive power—[so that] through him, the exercise of executive power remains accountable to the people." *Arthrex*, 594 U.S. at 27.

\* \* \*

Underscoring the constitutional infirmity, "[a]lthough structural 'innovation' is not itself unconstitutional, a novel agency fights uphill: 'the lack of historical precedent for an entity is perhaps the most telling indication of a severe constitutional problem.'" *PHH Corp.*, 881 F.3d at 144 (Henderson, *J.*, dissenting) (cleaned up, quoting *Mistretta v. United States*, 488 U.S. 361, 385 (1989) and *Free Enter. Fund,* 561

U.S. at 505). And that proposition holds true "[h]ere too: Perhaps the most telling indication of the severe constitutional problem with the [Tax Court] is the lack of historical precedent for this entity." *Id.* at 166 (Kavanaugh, *J.*, dissenting).

While the Tax Court's structure wholly forgoes any and all of the safeguards used in other multi-member executive bodies including for-cause restrictions on the President's removal powers, the historical anomalies extend even further, as Congress has declared that "[t]he Tax Court is not an agency of, and shall be independent of, the executive branch of the Government." 26 U.S.C. § 7441. But, even noting "the Supreme Court has cautioned that congressional pronouncements are not dispositive of the status of a governmental entity for purposes of separation of powers analysis under the Constitution," *Crim*, 66 F.4th at 1001 (cleaned up), the Tax Court's exercise of governmental power must still comply with the Constitution.

Accordingly, given that "the Tax Court exercises its authority as part of the Executive Branch[,]" *id.*, and that its "powers are, and have always been, executive... tax judges cannot be truly and fully 'independent' because 'lesser officers must remain accountable to the President, whose authority they wield.'" *Id.* at 1007 (Walker, *J.*, dissenting) (quoting *Seila*, 140 S. Ct. at 2197). Tax Court judges' virtually complete immunization from presidential oversight is "contrary to Article II's vesting of the executive power in the President. The President cannot 'take Care that the Laws be

28

faithfully executed' if he cannot oversee the faithfulness of the officers who execute them." *Free Enter. Fund*, 561 U.S. at 484 (quoting U.S. Const. art. II, § 3).

Indeed, the Supreme Court recently explained that there are "only two exceptions to the President's unrestricted removal power" for exercise of executive power — independent agencies and inferior officers with narrowly defined duties. *Seila*, 140 S. Ct. at 2192. Tax Court judges certainly are not inferior officers with narrowly defined duties (e.g., independent counsel).[5] And the Tax Court explicitly is not the other exception, i.e., it is not an agency — independent or otherwise — of the executive branch. 26 U.S.C. § 7441.

Such "structural innovation" imposes a more difficult burden, *PHH Corp.*, 881 F.3d at 144 (Henderson, *J.*, dissenting), to establish constitutionality and overcome "the most telling indication of the severe constitutional problem with the [Tax Court:] the lack of historical precedent for this entity." *Id.* at 166 (Kavanaugh, *J.*, dissenting). The historical existence of the Tax Court itself - not similarly structured entities - cannot satisfy the criterion. *See McGirt v. Oklahoma*, 140 S. Ct. 2452, 2482 (2020) (unconstitutional "acts, performed long enough and with sufficient vigor, are never

---

[5] Tax Court judges are not inferior officers at all, as "[w]hether one is an 'inferior' officer depends on whether he has a superior other than the President. An inferior officer must be directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Arthrex*, 594 U.S. at 13 (cleaned up).

enough to amend the law. To hold otherwise would be to elevate the most brazen and longstanding injustices over the law, both rewarding wrong and failing those in the right.").

Accordingly, the for-cause limitation of 26 U.S.C. § 7443(f) must be stricken.

### III. IF THE TAX COURT IS NOT AN EXECUTIVE ENTITY EXERCISING EXECUTIVE POWER, THE PRESIDENT'S REMOVAL AUTHORITY VIOLATES THE SEPARATION OF POWERS DOCTRINE.

#### A. The Tax Court is an Article I Court that Solely Exercises Judicial Power, Fully Independent of the Executive Branch.

Facing the interbranch arguments after the post-*Kuretski* amendment, in *Battat*, the Tax Court alluded to, but did not determine the Tax Court's location within the constitutional design.[6] However, "[s]tart[ing], as we always do, with the statutory language," *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1658 (2017), courts must "give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (cleaned up).  Thus, by virtue of the statutory

---

[6] Specifically, the Tax Court stated:

> In our view, the public rights holding above resolves the removal issue without requiring that we address the tension with legislative intent that might be thought to arise under the opinion of the Court of Appeals in *Kuretski*. Having decided petitioners' motion on that basis, we will follow the lead of Congress and the Supreme Court in *Freytag* and not further address the branch placement of the Tax Court here.

148 T.C. at 59.

amendments in 1969, Congress removed the Tax Court from the Executive Branch and squarely placed it in the Legislative Branch under Article I.

The Supreme Court has consistently reiterated that in interpreting a statue, courts are to presume "that the legislature says what it means and means what it says." *Henson v. Santander Consumer USA, Inc.*, 137 S. Ct. 1718, 1725 (2017) (cleaned up). Accordingly, giving effect to the language Congress has chosen for Section 7441, this Court should conclude that the Tax Court is located in Article I and is "independent of[ ] the executive branch of the Government" for all purposes. 26 U.S.C. § 7441.[7] Similarly, by referring to it as "a court of record [composed of] the chief judge and the judges" (*id.*) that exercises "such jurisdiction as is conferred" by the Code (26 U.S.C. § 7442), it is clear that the Tax Court solely exercises judicial power for separation of powers purposes.

The expansion of judicial functions and the reclassification of the Tax Court from independent agency to Article I Court was a point of discussion in *Freytag*. The Supreme Court analyzed the Tax Court's status in the constitutional scheme including the

---

[7] In its best light, a contrary interpretation reduces "the phrase [to] mere surplusage. Such a construction of a statute, however, is not favored by the law and would violate a fundamental rule of statutory interpretation-that in construing statutes courts should give effect, if possible, to every word used by Congress." *Symons v. Chrysler Corp. Loan Guarantee Bd.*, 670 F.2d 238, 241–42 (D.C. Cir. 1981) (cleaned up).

functions, form, and powers of the Tax Court and found that each is "quintessentially judicial in nature." 501 U.S. at 891.

In reaching its conclusion, the Supreme Court noted Congress expressly amended the Tax Court's classification from an "independent agency of the executive branch" to one of a "court of record under Article I." *Id.* at 885. And the Tax Court maintains a "function and role in the federal judicial system [that] closely resemble[s] those of the federal district courts." *Id.* at 891. Consequently, the High Court concluded the Tax Court "exercises judicial, rather than executive, legislative, or administrative, power... a portion of the judicial power of the United States." *Id.* at 890-91. The Supreme Court's views were pellucid: "The Tax Court exercises judicial power to the exclusion of any other function... [and] remains independent of the Executive and Legislative Branches." *Id.* at 891. Consequently, the Tax Court is among the Article I courts "that exercise judicial power and perform exclusively judicial functions among the 'Courts of Law[.]'" *Id.* at 892.

The Tax Court is not precluded from exercising judicial power because it is a legislative court; rather, "non-Article III tribunals [can] exercise the judicial power of the United States." *Freytag*, 501 U.S. at 889 (citation omitted). However, the Constitution's separation of powers requirement endures.

**B.    The Separation of Powers Doctrine is not Limited to Article III Judges and Applies with Equal Force to Article I Judges.**

The Tax Court's conclusion that "regardless of the branch location of the Tax Court, provisions authorizing removal of Tax Court Judges are constitutional[,]" *Battat*, 148 T.C. at 52, is as shocking as it is unprecedented. In any event, it is wrong.

"Our Constitution divided the powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial." *Free Enter. Fund*, 561 U.S. at 483 (cleaned up). "Within our political scheme, the separation of governmental powers into three coordinate branches is essential to the preservation of liberty." *Mistretta*, 488 U.S. at 380. "Stated in its simplest terms, the separation of powers doctrine prohibits each branch of the government from intruding upon the central prerogatives of another." *United States v. Moussaoui*, 382 F.3d 453, 469 (4th Cir. 2004) (cleaned up). "Such an intrusion occurs when one branch arrogates to itself powers constitutionally assigned to another branch or when the otherwise legitimate actions of one branch impair the functions of another." *Id.*

The Separation of Powers Doctrine applies throughout our tripartite system of government and is not limited, as the *Battat* decision determined, to the Executive Branch's intrusion into Article III. *See* 148 T.C. at 53 ("In considering the constitutionality of section 7443(f), the question that arises is: 'Does providing to the President the authority to remove Tax Court Judges give the President any

33

unconstitutional power to interfere with the Article III judicial power of the United States?'"). Indeed, to state the very premise of the *Battat* decision is to reject it.

*Battat* created a wholesale exclusion for the Tax Court from the Separation of Powers Doctrine, concluding that interbranch removal was constitutionally permissible "regardless of the branch location of the Tax Court[.]" *Id.* at 52. But no Supreme Court cases confine a separation of powers analysis to only Article III courts or judges. Rather, the Supreme Court in *Mistretta* refers to the "Judicial Branch" and not Article III courts or judges. *See* 488 U.S. at 383. Certainly, the analysis must be the same for exercise of judicial power regardless of the branch, i.e., an Article III or an Article I court, as neither the President as Executive nor Congress as the Legislature may encroach upon a judge exercising *judicial powers*, the *sine qua non* of separation *of powers*.

Unsurprisingly, given that *Battat* created the public rights exception to separation of powers analysis out of whole cloth, it appears no cases exist to support that analysis, but abundant caselaw establishes that the Separation of Powers Doctrine is not as limited as the Tax Court suggests. *See, e.g., Bowsher v. Synar*, 478 U.S. 714 (1986) (Congress may not exercise removal power over officer performing executive functions); *I.N.S. v. Chadha*, 462 U.S. 919 (1983) (Congress may not control execution of laws except through Article I procedures); *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) (Congress may not confer Article III power

on Article I judges). Accordingly, the Separation of Powers Doctrine fully applies to the Tax Court writ large and to Section 7443(f) writ small; the conclusion to the contrary was inescapably incorrect.

Tellingly, other Article I judges are not removable by the Executive. For example, federal magistrate judges are not removable by the President. Rather, "[r]emoval shall be by the judges of a district court[.]" 28 U.S.C. § 631(i). The same holds true for federal bankruptcy judges. *See* 28 U.S.C. § 152(e). Similarly, judges on the Court of Federal Claims (perhaps the most comparable federal officials to Tax Court judges) are not removable by the President, but by Article III judges of the Federal Circuit. *See* 28 U.S.C. § 176(a). *See also Williams v. United States*, 289 U.S. 553, 565 (1933) (holding the Court of Claims, an Article I Court, exercises judicial power: "By these provisions it is made plain that the Court of Claims, originally nothing more than an administrative or advisory body, was converted into a court, in fact as well as in name, and given jurisdiction over controversies which were susceptible of judicial cognizance. It is only in that the appellate jurisdiction of this court in respect of the judgments of that court could be sustained, or concurrent jurisdiction appropriately be conferred upon the federal District Courts. The Court of Claims, therefore, undoubtedly, in entertaining and deciding these controversies, exercises judicial power....").

While the Tax Court's function was systematically statutorily altered (similar to the Court of Federal Claims), Section 7443(f) remains a relic of past incarnations, incompatible with the constitutional design.

### C. *Battat* Misapplied Supreme Court Separation of Powers Precedents, and the Analysis is the same for Article I Judges as Article III judges.

*Battat* primarily relied upon four Supreme Court cases – *Bowsher, Morrison, Mistretta,* and *McAllister* – none of which addressed the removal of a federal judge in the context of exercising the judicial power of the United States. Moreover, none of these four cases supported the logic that the President's removal power over Tax Court judges does not run afoul of the Separation of Powers Doctrine. Indeed, they are to the contrary.

#### 1.    *Bowsher v. Synar.*

*Bowsher* determined that a remarkably similar for-cause removal provision under 31 U.S.C. § 703(e)(1)(B), which allowed Congress to remove the Comptroller General, for among other things, "inefficiency," "neglect of duty," or "malfeasance," violated the Constitution's separation of powers principles. Finding that removal power unconstitutional, the Supreme Court noted the "breadth of the grounds for removal." *Bowsher,* 478 U.S. at 729. "These terms are very broad and, as interpreted by Congress, could sustain removal of a Comptroller General for any number of actual or perceived transgressions of the legislative will[,]" (*id.*) causing a "here-and-now subservience to

another branch that raises separation-of-powers problems." *Id.* at 727 n. 5. Moreover, the Supreme Court found that it was inconsequential that Congress had not used such power to remove a sitting Comptroller General. The mere threat made the removal authority "constitutionally impermissible." *Id.* at 727.

Likewise, the President cannot be vested with removal power over Tax Court judges exercising judicial power as such "would, in practical terms, reserve in [the President] control over the [adjudication] of the laws." *Id.* Even limited to for-cause removal, the threat of a President leveraging the power, which has severe repercussions to a Tax Court judge, provides the President with the potential tool to coerce conformance with political motives: "Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey." *Id.* (cleaned up). *See also Edmond v. United States*, 520 U.S. 651, 664 (1997) ("The power to remove officers, we have recognized is a powerful tool for control."). The Supreme Court's analysis in *Bowsher* applies with the same force to the President's power to remove Tax Court judges as it did to Congress's power to remove the Comptroller General: both violate the Separation of Powers Doctrine.

2.    *Morrison v. Olson.*

Cross-branch removal was addressed in *Morrison v. Olson*, 487 U.S. 654 (1988). In *Morrison*, the Supreme Court considered whether 28 U.S.C. § 596(b)(2), which authorizes judicial officers to "terminate an office of independent counsel at any time, on the ground that the investigation of all matters within the prosecutorial jurisdiction of such independent counsel or accepted by such independent counsel under section 594(e), and any resulting prosecutions, have been completed…[,]" violated the separation of powers.

The Supreme Court answered in the negative: "The termination provisions of the Act do not give the Special Division anything approaching the power to remove the counsel while an investigation or court proceeding is still underway…." *Morrison*, 487 U.S. at 682. Instead, removal power was "solely vested in the Attorney General." *Id.* In other words, because there was "no requirement of congressional approval of the Attorney General's removal decision," *id*. at 686, there was no separation of powers violation, and the act was constitutional.

Critically, *Morrison* concerned termination of an *office* that is by design temporary, not the removal of an officeholder. Here, the President is not given authority to eliminate the position of Tax Court judges, but to remove a particular Tax Court judge from office. Thus, Section 7443(f) threatens the independent exercise

of judicial power by unconstitutionally allowing the removal of judicial officers by the Executive.

### 3.    *Mistretta v. United States.*

Cross-branch removal was also the subject of *Mistretta*, where the Supreme Court considered whether the President's authority to remove Article III judges from the United States Sentencing Commission (the "Commission") violated the separation of powers. Finding there was no constitutional violation under such a scheme, the Supreme Court focused on the powers exercised by judges serving on the Commission. As the Supreme Court noted, "[t]he Sentencing Commission unquestionably is a peculiar institution within the framework of our Government.  Although placed by the Act in the Judicial Branch, it is *not a court and does not exercise judicial power*."  *Mistretta*, 488 U.S. at 384-385 (emphasis added). The Supreme Court found that judges were "serving on a nonadjudicatory commission" that "is not exercising judicial power." *Id.* at 411 n. 35. Thus, "because such limited removal power gives the President no control over judicatory functions, interbranch removal authority under these limited circumstances poses no threat to the balance of power among the Branches." *Id.*

*Mistretta* concerned the President's ability to remove judges *only* from their roles in the Commission, leading to the conclusion that, like the President's appointment power, "[t]he President's removal power over Commission members poses a similarly

negligible threat to judicial independence. The Act does not, and could not under the Constitution, authorize the President to remove, or in any way diminish the status of Article III judges, *as judges*." *Id.* at 410 (emphasis added). Therefore, the High Court explained, "[e]ven if removed from the Commission, a federal judge appointed to the Commission would continue, absent impeachment, to enjoy tenure 'during good Behaviour' and a full judicial salary." *Id.* (citation omitted).

> The only similarity presented to the instant issue is that

> the President's removal power under the Act is limited. In order to safeguard the independence of the Commission from executive control, Congress specified in the Act that the President may remove the Commission members only for good cause. Such congressional limitation on the President's removal power... is specifically crafted to prevent the President from exercising "coercive influence" ....

*Id.* at 410–11 (footnote omitted).

But in addition to the for-cause limitation on removal authority – solely in appointees' *non-judicial roles in the Commission* – the safeguards present in *Mistretta* prevented a Separation of Powers violation: "In other words, since the President has no power to affect the tenure or compensation of Article III judges, even if the Act authorized him to remove judges from the Commission at will, he would have no power to coerce the judges in the exercise of their judicial duties." *Id.*

*Mistretta* perfectly illustrates why the President's removal power over Tax Court judges, *as judges*, is constitutionally infirm. The President's removal power *confined to*

*the non-judicial aspects of their roles* in *Mistretta* is absent and reveals the constitutional problem here. The President's removal authority under Section 7332(f) strips Tax Court judges of all aspects of employment, and even permanently bars them from ever practicing before the Tax Court as a lawyer. *See* 26 U.S.C. § 7443(g) (prohibiting subsequent Tax Court practice). Given the drastic consequences Presidential removal has upon Tax Court judges, the threat of removal gives the President significant potential for "coercive influence" that was absent in *Mistretta*.

### 4.    *McAllister v. United States.*

In *McAllister v. United States*, 141 U.S. 174 (1891), President Cleveland removed Judge McAllister from his Article IV judgeship in the District of Alaska. Importantly, McAllister did not challenge his removal but sued in the Claims Court for wages he claimed he was entitled to. The Supreme Court concluded that the District of Alaska, a then Article IV Court, was not a "court of the United States" (i.e., an Article III Court), hence unlike Article III judges who cannot have their salaries diminished while in office "no such guaranties are provided by that instrument in respect to judges of courts created by or under the authority of congress for a territory of the United States." *Id.* at 187.

*McAllister* stands for the proposition that federal territorial judges could have their salaries reduced (or not paid at all), but does not stand for the broad proposition that cross-branch removal of non-Article III judges is permissible. Indeed, *McAllister* uniquely

41

concerned the limitations of Congress's plenary power over Territories pursuant to Article IV: "The whole subject of the organization of territorial courts, the tenure by which the judges of such courts shall hold their offices, the salary they receive, and the manner in which they may be removed or suspended from office, was left by the constitution with congress, under its plenary power over the territories of the United States." *Id.* at 188. *See also* U.S. Const. art. IV, § 3.

*McAllister* is readily distinguishable as involving Article IV courts, unique to territories, which are intended to be temporary (until statehood), and where the Constitution as a whole does not even apply of its own force. *See, e.g.,* 48 U.S.C. § 1561 (selectively applying by statute, *inter alia*, the Bill of Rights to the U.S. Virgin Islands).

\*\*\*

Given that (i) the Tax Court exercises judicial power; (ii) Congress has clearly, systematically, and repeatedly passed legislation which establishes the independence of the Tax Court from the Executive branch; and (iii) other similarly situated Article I judges with powers which would properly be classified as judicial in nature are not removable by the President but, rather, removable for cause by the judiciary, it is evident that Section 7443(f) is a nearly century-old vestige that harkens back to a time before the Tax Court was a federal trial court and before its members were federal judges.

Additionally, if this Court were to uphold the *Battat* decision[8] finding the Separation of Powers Doctrine does not apply, the ramifications of the holding would ripple out to all Article I judges. Bankruptcy judges, magistrate judges, and Court of Claims judges, would necessarily fall within the holding of *Battat.* Accordingly, applying the logic of *Battat* to the other Article I judges, the removal of the non-Tax Court Article I judges by Article III judges would have to implicate the Separation of Powers Doctrine. That is to say either Article I judges can be removed by the President without violating the Separation of Powers doctrine, or Article I judges can be removed by Article III judges without violating the doctrine, but the Separation of Powers Doctrine cannot allow both conclusions.

### D.    The Public Rights Doctrine has no Impact on a Separation of Powers Analysis.

*Battat* created a *sui generis* legal test for the separation of powers analysis, *viz.,* whether a court adjudicates only "public rights disputes." 48 T.C. at 55; *see generally id.* at 52-55. But the Public Rights Doctrine jurisprudence relied on was wholly inapplicable to a separation of powers analysis; instead, the caselaw cited in *Battat* stands for the unremarkable proposition that Congress can create adjudicatory bodies outside of Article III without violating Article III's command vesting "[t]he judicial

---

[8] The order denying the motion asserting interbranch arguments below relied exclusively on *Battat*. R.32.

Power of the United States" in Article III courts. U.S. Const. art. III, § 1. *See Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) (Under that doctrine, Supreme Court "precedents have given Congress significant latitude to assign adjudication of public rights to entities other than Article III courts.").

Accordingly, Congress can assign public rights cases to be heard before Article I judges,[9] before Article III judges,[10] or before Article IV judges,[11] but the ability of Congress to assign public rights cases to specific courts does not speak to the Constitution's commands generally or the separation of powers specifically. Thus, the Tax Court's holding that the public rights doctrine affects a separation of powers analysis in any respect must be rejected.

Importantly, the Tax Court's public rights analysis has no limiting principle. Indeed, if there is no impediment to the President removing a Tax Court judge based on adjudicating only public rights cases, then, by the same logic, there would have to be no impediment to the same for Claims Court judges who, by definition, adjudicate only public rights cases. By the same token, if a District Court judge was adjudicating

---

[9] *See N. Pipeline*, 458 U.S. at 73-74; 28 U.S.C. § 1491 (Claims Court jurisdiction for tax refund lawsuits – "Tucker Act");

[10] *See* 26 U.S.C. § 7402 (jurisdiction of district courts); 28 U.S.C. § 1346 (district court jurisdiction, concurrent with Claims Court, for tax refund lawsuits – "Little Tucker Act").

[11] *See* 48 U.S.C. § 1612(a) (providing that the District Court of the Virgin Islands has the jurisdiction of a District Court of the United States).

a public rights case, e.g., a tax refund lawsuit, there would have to be no impediment to the President removing that judge from the case. Further, to the extent there could be some argument made that District Court judges, by virtue of their status under Article III, are different, the logic of *Battat* would break down when there is concurrent Claims Court and District Court jurisdiction under the Little Tucker Act and the Tucker Act,[12] or when the Tax Court, the Claims Court, and the District Courts can adjudicate similar tax disputes.[13] In other words, the purported public rights distinction necessarily dissolves when applied to common public rights disputes between the American public and its government.

Moreover, the Tax Court's framing the separation of powers issue as limited to Executive control that "interfere[s] with the Article III judicial power[,]" *Battat*, 148 T.C. at 53, was wrong. The Separation of Powers Doctrine applies to any instance of one branch of government improperly intruding into the realm (i.e., the exercise of power) of another branch, *see McMellon v. United States*, 387 F.3d 329, 341 (4th Cir. 2004). The public rights distinction is of no moment and *Battat* was wrongly decided.

\* \* \*

---

[12] *See* 28 U.S.C. § 1346(a); 28 U.S.C. § 1491.
[13] *See* 26 U.S.C. § 6228(a) (Tax Court, District Court, and Claims Court jurisdiction to review a final partnership administrative adjustment).

Long before the foundation of this great Republic the "separation of powers was known to be a defense against tyranny... prompting the Founders to protect against such tyranny "by the very structure of the Constitution," by employing "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Id.* at 340-41 (cleaned up). The decision below defies this fundamental safeguard.[14]

At bottom, separation of powers forbids vesting power in the Executive over a different branch's power to ensure the structural design of our tripartite system of government – "[t]he structure of the Constitution does not permit Congress to execute the laws; it follows that Congress cannot grant to an officer under its control what it does not possess" – it also follows that Congress cannot give the Executive the power to control adjudication of the laws. *Bowsher*, 478 U.S. at 726.

---

[14] In the counterintuitive event the Tax Court is an Executive entity but exercises solely judicial, and no Executive, power, the Separation of Powers Doctrine nevertheless proscribes Presidential removal authority because it requires the *separation of powers*, not necessarily the *separation of branches* of government. The Supreme Court has noted that "the Framers did not require—and indeed rejected—the notion that the three Branches must be entirely separate and distinct." *Mistretta*, 488 U.S. at 380. Interbranch removal of an official, may be permissible when a cross-branch officer is *exercising the same power* as the removing official. But intrabranch removal is prohibited when the intrabranch officer is *exercising a different power* than the removing official – as is the case here. *See Bowsher*, 478 U.S. at 734.

This Court should follow that logic and reason that the President, as the Executive who is charged with executing the laws, may not wield removal power over a Tax Court judge charged with adjudicating them and who "exercises judicial power to the exclusion of any other function... [and] remains independent of the Executive and Legislative Branches." *Freytag*, 501 U.S. at 891. Accordingly, this Court should hold Section 7443(f) unconstitutional and excise it from Section 7443, reverse the decision below, and remand for new proceedings before a different Tax Court judge.

## IV. A VALID JOINT RETURN IS A REQUIRED FINDING TO UPHOLD A DETERMINATION DENYING INNOCENT SPOUSE RELIEF.

The Tax Court concluded that Appellant was not entitled to relief from joint and several liability, finding that "[t]he tax liabilities [Appellant] seeks relief from are solely attributable to her income." R.63 at 9. But that finding is preconditioned on an assumption that the joint tax return was legally valid. Finding that the *liabilities are attributable to Appellant* necessarily requires a determination that the joint tax return validly imposed the liabilities. The Tax Court's failure to determine whether any valid joint tax return existed for any year at issue was an error of law that defies common sense, the statutory text, IRS guidance, and prior cases concluding to the contrary.

"Whether a joint return has been filed is a question of fact, the resolution of which depends upon the intent of the parties. To file jointly both spouses must intend to make a joint return." *Okorogu v. Comm'r of Internal Revenue*, T.C. Memo. 2017-53,

2017 WL 1192118, at *7 (2017) (citing *Heim v. Commissioner*, 27 T.C. 270, 273–274 (1956), *aff'd*, 251 F.2d 44 (8th Cir. 1958)). However, the Tax Court explicitly refused to make any such finding; rather, holding, "[r]egardless of whether [Appellant] consented to having joint returns filed on her behalf, we lack jurisdiction to review that claim in this proceeding insofar as it might bear on the correctness of the assessments." R.63 at 6.

The Tax Court's omission of this threshold determination defies common sense and ignores the plain language rife throughout Section 6015, which prescribes that "an individual *who has made a joint return* may elect to seek relief under the procedures prescribed under subsection (b)" and affords relief from joint and several liability under subsection (b) if "a *joint return has been made* for a taxable year" or under subsection (c) "if an individual *who has made a joint return* for any taxable year" and the individual meets certain other conditions. 26 U.S.C. § 6015(a)(1), (b)(1)(A), and (c)(1) (emphasis added). To be clear, the various other conditions are inapposite *unless* the individual has filed a joint return.

The Tax Court put the cart before the horse, paradoxically holding that it lacked jurisdiction to determine the *correctness* of the assessments while, by necessary implication, upholding the *validity* of the tax returns, a prerequisite to the assessments imposing liability. Forsooth, it is elementary that without a valid return, there can be

48

no valid assessment. *See* 26 U.S.C. § 6201(a)(1) ("The Secretary shall assess all taxes determined by the taxpayer or by the Secretary as to which returns ... are made under this title."); 26 U.S.C. § 6020(b)(1) (for a non-or-fraudulent filer, "the Secretary shall make such return..."). The Tax Court could not consider whether Appellant was entitled to relief under Section 6015 *unless* it found that, for each applicable year, a valid joint return was filed; otherwise, there could be no liability at issue.

The decision below cannot be reconciled with cases holding directly contrary: "The primary issue in this case is whether the returns for the taxable years, which were not signed by petitioner, were joint returns rendering petitioner jointly and severally liable for deficiencies [and an underpayment] determined by respondent[.]" *Groves v. Comm'r*, T.C. Memo. 1957-196, 1957 WL 810 (1957). The Tax Court entirely omitted consideration of threshold factors that vitiated the validity of any purported liability – Appellant "did not authorize anyone to sign her name to the returns; she did not know the returns had been filed; she did not participate in their preparation[.]" *Id.* These factors were essential, as "*intent is a prerequisite* to the establishment of joint liability on the part of the spouse who has not signed a return which purports to be joint." *Id.* (citation omitted, emphasis added).

While "[i]t is true that where a husband filed a joint return, without objection of the wife, who failed to file a separate return, it will be presumed the joint return

was filed with the tacit consent of the wife. However, this presumption, arising from respondent's determination of deficiencies, may be rebutted. In the instant case it is our opinion that there is ample evidence to rebut this presumption." *Id.* The same recognition holds true here, but the Tax Court refused to consider it.

That error of law turned the proper analysis on its head:

> We must first determine whether the return filed by Alvin was Alvin's and petitioner's joint return. Because we find that petitioner has proven that she did not file a joint return with Alvin, we need not address the second issue — whether petitioner is absolved, under the innocent spouse exception of [then] section 6013(e), from liability for the deficiency asserted herein.

*Snyder v. Comm'r*, T.C. Memo. 1983-751, 1983 WL 14739 (1983).

The decision below implicitly found the joint returns were valid while ignoring all of Appellant's testimony (as the sole witness) to the contrary, despite that "[t]he critical question is factual — did [Appellant] intend to file a joint return?" *Id.*

Moreover, the Tax Court failed to uphold the IRS's own guidance, which specifically prescribes *the first step* is to determine whether a valid joint return exists. Upon an answer of "No," the matter is discharged as there can be no liability that requires relief:

> Section 6015 provides relief only from joint and several liability arising from a joint return. If an individual signs a joint return under duress, *the election to file jointly is not valid and there is no valid return with respect to the requesting spouse. The individual is not jointly and severally liable for any income tax liabilities arising from that return.* In that case, section 6015 does not

50

apply and is not necessary for obtaining relief. *If an individual files a claim for relief under section 6015, but also maintains that there is no valid joint return due to duress, the Service will first make a determination as to the validity of the joint return and may accordingly deny the request for section 6015 relief based on the fact that no joint return was filed (and thus, relief is not necessary).* If it is ultimately determined that a valid joint return was filed, the Service will then consider whether the individual would be entitled to relief from joint and several liability on the merits.

Rev. Proc. 2013-34, § 2.03 (emphasis added).[15]

Consistent with Rev. Proc. 2013-34, the Code in general, and common sense, "[because Appellant] herein did not intend to and did not in fact file a joint return she incurs no joint and several liability based on a joint return." *Helfrich v. Comm'r*, 25 T.C. 404, 408 (1955), *acq., IRS Announcement Relating to: Helfrich* (IRS ACQ Dec. 31, 1956). The decision below fundamentally misapplied the law, which requires that "*before we render a determination* on the merits of W's claim for equitable relief, we must determine whether the returns filed for petitioners for [the years at issue] were valid joint returns." *Okorogu*, 2017 WL 1192118, at *6 (emphasis added).

The Tax Court averred that it reached its decision to deny equitable relief under Section 6015(f) after "[t]aking into consideration all the facts and circumstances," R.63 at 9, but explicitly refused to take into consideration the precise fact and

---

[15] There is no analytical difference between a purported joint return that was filed without a spouse's necessary intent to file jointly and a purported joint return filed with the spouse's signature procured through duress. In either case, the joint return is ineffective to the spouse with the result that no liabilities can attach.

circumstance that aggrieved Appellant – that she was being held accountable for liabilities reported on a return that she did not consent to file. The failure to do so illustrates the Tax Court's jurisdictional error as well, finding it had jurisdiction to hear the case based on the claim, final determination, and timely petition, but that it "lack[ed] jurisdiction to review [the] claim" that no valid joint return was filed. R.63 at 5, 6.

Although a valid joint return may not be a direct jurisdictional element, it necessarily becomes a jurisdictional element when genuinely at issue because without a valid joint return, there can be no case or controversy, i.e., the case is moot.

> *We first address whether petitioner and Mr. Pike made a valid joint Federal income tax return* for 2010.... If the 2010 joint return is not a valid joint return, *then she is not liable* for the underpayment reflected thereon and the issue of whether she is entitled to relief under section 6015(f) for 2010 *becomes moot.*

*Jones v. Comm'r of Internal Revenue*, T.C. Memo. 2019-139, 2019 WL 5212450, at *4 (T.C. 2019) (emphasis added).

And, "[b]ecause mootness is jurisdictional, a moot case must be dismissed." *Purpose Built Fams. Found., Inc. v. United States*, 95 F.4th 1346, 1352 (11th Cir. 2024) (cleaned up). Moreover, "[a] federal court has an independent duty to ensure that it has subject-matter jurisdiction." *McIntosh v. Royal Caribbean Cruises, Ltd.*, 5 F.4th 1309, 1312 (11th Cir. 2021). The decision below violates this black-letter law.

The Tax Court's failure to make any such finding and uphold a determination of joint and several liability for an invalid tax return misapplied the language of the Code, failed to uphold the IRS's own guidance, conflicted with prior Tax Court decisions, and violated long-settled jurisdictional principles, directly contrary to the underlying purpose of innocent spouse review and common sense to boot. Consequently, the decision below must be reversed and the case remanded for consideration of whether Appellant consented to file jointly for each year at issue.

## CONCLUSION

The Supreme Court "ha[s] explained on many prior occasions, the separation of powers is designed to preserve the liberty of all the people." *Collins*, 141 S. Ct. at 1780. That liberty is not suspended upon adjudication of public rights cases; rather, the separation of powers is required and applies in full to the Tax Court.

As an Article I court,[16] the Tax Court exercises Executive power, and Section 7443(f)'s for-cause restriction violates the Constitution by preventing the President from exercising the exclusive duty to "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3.

---

[16] Indeed, if it is an Article III court, the 15-year term limit violates the Constitution's requirement for lifetime tenure "during good Behaviour," U.S. Const. art. III, § 1.

Alternatively, if the Tax Court truly is "independent[ of, i.e., not a part] of, the executive branch of the Government[,]" 26 U.S.C. § 7441, then Section 7443(f)'s grant to the President power to remove Tax Court judges exercising Judicial but not Executive power violates "the separation of governmental powers into three coordinate branches[, which] is essential to the preservation of liberty[,]" *Mistretta*, 488 U.S. at 380, as the "power to remove officers... is a powerful tool for control." *Edmond*, 520 U.S. at 664.

There is no question that Section 7443(f) unconstitutionally violates the separation of powers – the only question is the remedy. This Court must reverse the decision below and *either* strike Section 7443(f)'s for-cause limitation (if the Tax Court exercises Executive power) *or* strike Section 7443(f) entirely (if the Tax Court exercises non-Executive, solely Judicial power) and grant Appellant new Tax Court proceedings before a different judge. *See Lucia v. S.E.C.*, 585 U.S. 237, 251 (2018) ("[Judge Gale] has already both heard [Appellant's] case and issued an initial decision on the merits. He cannot be expected to consider the matter as though he had not adjudicated it before.").

Additionally, the failure to make the required finding of whether a valid joint tax return existed requires new proceedings, in which the Tax Court must determine whether Appellant filed jointly for each of the years at issue.

Respectfully Submitted,                  April 26, 2024

/s/ Joseph A. DiRuzzo, III
Joseph A. DiRuzzo, III
Fla. Bar. No. 0619175
MARGULIS GELFAND DIRUZZO & LAMBSON
401 East Las Olas Blvd., Suite 1400
Ft. Lauderdale, FL 33301
954.615.1676 (o)
954.827.0340 (f)
jd@margulisgelfand.com

/s/ Daniel M. Lader
Daniel M. Lader
Fla. Bar No. 1004963
MARGULIS GELFAND DIRUZZO & LAMBSON
401 East Las Olas Blvd., Suite 1400
Ft. Lauderdale, FL 33301
954.615.1676 (o)
954.827.0340 (f)
dan@margulisgelfand.com

/s/ Stone T. Hendrickson
Stone T. Hendrickson
MO Bar No. 74384
MARGULIS GELFAND DIRUZZO & LAMBSON
7700 Bonhomme Ave., Suite 750
St. Louis, MO 63105
314.390.0234 (o)
314.485.2264 (f)
stone@margulisgelfand.com

*Pro Bono Counsel for the Appellant, Fannie Wright*

## CERTIFICATE OF COMPLIANCE RE: WORD COUNT

Pursuant to Fed. R. App. P. 32(g) counsel certifies that this brief is in compliance with the 13,000 type-volume limitation of Rule 32(a)(7)(B)(i). The instant brief is 13,000 words in length. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, Goudy Old Style font in 14 point.

/s/ Daniel M. Lader
Daniel M. Lader

## CERTIFICATE OF SERVICE

I certify that on April 26, 2024, a copy of the foregoing was uploaded via the Court's electronic filing system, which will provide a NEF to counsel of record. Upon the Court's ruling on the pending motion to proceed IFP (Doc. # 2) and motion to waive paper copies (Doc. # 18), the appropriate number (if any) of paper copies of the brief and the Appendix on Appeal will be submitted via USPS to the Court and to the following counsel for Appellee:

Bethany B. Hauser
U.S. Dept. of Justice, Tax Division, Appellate Section
Post Office Box 502
Washington, D.C. 20044
Bethany.B.Hauser@usdoj.gov

/s/ Daniel M. Lader
Daniel M. Lader

56